UNITED STATES of America,
Plaintiff-Appellee,

and

Mexican American Legal Defense Fund,
Lulac and G. I. Forum,
Plaintiffs-Intervenors-Appellees,

v.

STATE of TEXAS, et al.,
Defendants-Appellants.

Nos. 81–2196, 81–2310 and 81–2330.

United States Court of Appeals,
Fifth Circuit.

July 12, 1982.

---

Mark White, Atty. Gen. of Tex., C. Ed Davis, Asst. Atty. Gen., William C. Bednar, Jr., Austin, Tex., for State of Tex.

Kelly Frels, Houston, Tex., for Houston Ind. School Dist.

Susan E. Waite, Houston, Tex., for Legal Foundation of America.

Michael D. Simpson, Washington, D. C., for Nat. Educ. Assoc.

Miriam R. Eisenstein, Walter W. Barnett, Attys., U. S. Dept. of Justice, App. Section, Civil Rights Div., Washington, D. C., for the U. S.

Peter D. Roos, Director, Educ. Litigation, MALDEF, San Francisco, Cal., for MALDEF.

Roger L. Rice, Center for Law & Educ., Inc., Cambridge, Mass., for LULAC and G. I. Forum.

Alan Jay Rom, Boston, Mass., for Deans, et al.

Richard Arnett, Deputy Com'r for Legal Services, Texas Educ. Agency, Austin, Tex., for Tex. Educ. Agency.

Before BROWN, GEE and GARWOOD, Circuit Judges.

GEE, Circuit Judge:

Procedural oddities characterized the trial of this case of great importance and are prominent among the matters assigned as error on appeal. Oral argument and an exhaustive canvass of the vast record have convinced us that the factual underpinnings of the proceedings below were too severely flawed to serve as the basis for the truly momentous decree of the trial court—one that affects the education of every student of limited English-speaking ability in the State of Texas and casts aside the state's language-remedial scholastic program in favor of one devised by the district court itself. We reverse.

*Remote Procedural History*

This appeal is another spinoff of the district court's general undertaking to supervise broad aspects of Texas' educational system and policy, an undertaking that commenced with a suit filed there by the United States in early 1970. That suit had as its target nine allegedly all-black school districts located generally in the northeastern portion of the state and eventuated in a comprehensive order directed to the Texas Education Agency ("TEA") concerning its responsibilities statewide, as well as the retention of jurisdiction by the trial court over TEA and thus, indirectly, over the Texas public school system at large.

As the opinion below notes, numbers of other actions followed concerning school districts around the state. *United States v. State of Texas*, 506 F.Supp. 405, 410 n.1 (E.D.Tex.1981). Among the provisions of the court's initial, far-ranging order was its section G, one requiring TEA to carry out a study of the educational needs of minority children throughout the entire state and to report its findings to the district court. Specific mention was made of "educational programs designed to compensate . . . for unequal educational opportunities and ethnic isolation, as well as programs . . . designed to meet the specific educational needs of students whose primary language is other than English . . . ." *Id.* at 409. In 1972, the appellees League of United Latin American Citizens ("LULAC") and GI Forum were allowed to intervene as representatives of all Mexican-Americans in Texas; and in 1975 these appellees, in effect, filed the present suit. This they did by moving for "enforcement" of the above-quoted portion of section G of the district court's prior order and for additional relief, claiming that Mexican-American students were being unequally treated in the Texas

public schools. Thus the stage was set for the unusual procedural developments that attended trial and judgment in our case.

*The Constitutional Issues: Arrival, Departure, and Return*

Some time after the filing of appellees' motion, the defendants moved for the convening of a three-judge court, pointing out specific claims of constitutional violations in the motion, in its request for injunctive relief, and so on.[1] In apparent response, at a hearing held in November 1976 on that motion, counsel for appellees stated, "we would move to amend our pleadings to clear up any question about that by deleting *the constitutional claims.*" (emphasis added). To this the court responded: "I'm going to grant the motion to amend that has been filed by the intervenors in which they *disclaim any intention to proceed under the Constitution.*"[2] (emphasis added). Some months later plaintiffs did amend their pleadings to delete all direct references to the Constitution, and later still, in June of 1978, the court entered its formal order denying defendants' request for a three-judge court, writing in part as follows:

A three-judge court is required to hear "any suit which seeks to interpose the *Constitution* against enforcement of a state policy." *Phillips v. United States,* 312 U.S. 246, 251, 61 S.Ct. 480, 483, 85 L.Ed. 800 (1941) (emphasis added). In their present state, the pleadings in this case simply do not reflect such a suit. Although in their original Motion to Enforce the July 13 Order, plaintiff-intervenors alleged that defendants' actions violated "the Order of this Court and the Constitution and laws of the United States", a subsequent amendment excised all occurrences of the words "and the Constitution." In other words plaintiff-intervenors have chosen to ground their claim for relief not in the Constitution, but rather solely in the above specified federal statutes. At best, therefore, the Court has before it a claim that the Texas Bilingual Act of 1973 conflicts with two federal statutes.

(emphasis in original).

Later, however, the judge was to conclude that by time of trial, in December 1979, the constitutional issues had re-entered the case and were tried to him by implied consent of the defendants. Thus, having been abandoned by the plaintiffs in order to avoid a three-judge court, and having been read out of the case's front door by a formal order, these issues finessed the three-judge tribunal, found their way back into court by the window, were tried by a single judge, and form the primary and major basis of the court's opinion in the case. Nor, despite this peculiar scenario, can we, in view of actions by counsel for the defendants that we will describe shortly, disagree with the court that defendants' counsel, at any rate, believed that the constitutional issues were presented and were tried.

*Constitutional Issues: Of Pretrial Orders and Proposed Opinions*

Primary responsibility for the handling of the case for the state and the defendant agency and official was assigned by the

---

**1.** As a case pending at the time of Congress' substantial abolition of the three-judge procedure, this was exempt from the repealer's provisions.

**2.** At oral argument before us, however, counsel's recollection of these events was somewhat different:

Your honor, as the lawyer who is quoted in the state's brief as having excised the constitutional issues, I suppose I can only tell you what I felt we did. *As we understood it, there were two sets of constitutional issues.* There was the *Lau* equal protection issue that had never been reached by the Supreme Court. The way the *Lau* case went up it was both a Title VI case and an equal protection case. The equal protection argument was, is it per se a violation of the equal protection clause not to provide understandable instruction or bilingual education. That issue was never reached by the Supreme Court. That's the issue that we understood we excised back in 1978. *There was a second constitutional issue, which was the continuing effects of past discrimination issue. That one,* which is related to the two statutory past discrimination claims I just referred to, *to our minds always remained in the case.*

(emphasis added).

Texas attorney general to Ms. Susan Dasher, a young assistant who had been licensed and practiced law in California for about three years before moving to Texas in 1978 and being, it appears, straightaway assigned to this case. The graduate of a law school not on the approved list of the Texas Supreme Court, Ms. Dasher was engaged in personal litigation throughout the term of her handling of this case seeking admission to the Texas bar, litigation that proved unsuccessful about the time of this appeal. *Dasher v. Supreme Court of Texas*, 650 F.2d 711, *op. on rehearing*, 658 F.2d 1045 (5th Cir. 1981). As, apparently, her sole source of assistance in this case, she was furnished a law student on whom—a somewhat poignant motion for continuance in the record advises—she "had to rely heavily . . . for the organization and preparation of the . . . case for trial."[3] Against this backdrop of counsel's relative inexperience and probable overextension, what followed in the handling of the case becomes more comprehensible, although some aspects of it remain curious indeed, and others all but defy analysis.

As of the entry, then, of the court's order of June 8, 1978, denying a three-judge court and minuting the removal of all constitutional issues from the case, the defendants had maneuvered these dangerous and difficult issues out of the case and faced only statutory claims. Yet, as we noted above, the trial court concluded that the constitutional issues later re-entered the case and decided it chiefly on the basis of them. Arguing that this was error, the state's appellate brief remarks, "It is simply astounding for the district court to have supposed that the defendants, having won this major procedural victory, somehow allowed the constitutional issue of alleged discrimination to be injected during the preparation of the 'pretrial order' or during trial of the case." Astounding it is indeed, but even so we must examine the record to determine whether it took place. We conclude that it did.

■ The first basis upon which the court below determined that these issues had re-entered the case was that of their inclusion in the so-called "Final Pre-Trial Order" filed by appellees on November 20, 1978. We have carefully examined that document which, with attachments, runs to over 200 pages and consumes an entire volume of the record. Nowhere in it appears any explicit reference to constitutional provisions or issues; all references are either to statutory provisions, such as 42 U.S.C. § 2000d, or 20 U.S.C. § 1703(f), or to section G of the court's seminal order. When pressed at oral argument to point to such a constitutional reference, counsel for appellees could do no more than refer to the use of the phrase "root and branch" in the pretrial order, remarking that "when we talk root and branch that to us is jargon for fourteenth amendment." We think this an entirely insufficient basis upon which to posit implied consent to litigate issues that had been once read out of the case in a formal order. Here, if anywhere, a clear reraising of the excised contention should be required. Such trials by implied consent are difficult to justify, depending as they do on determining that the parties recognized—or

---

**3.** Thus on Ms. Dasher's showing we deal, it appears, with an exceedingly complex and important case prepared and organized for trial by a law student.

The affidavit counsel filed in support of the motion reads:

I, Susan Joyce Dasher, Assistant Attorney General of the State of Texas, am the attorney representing the Texas Education Agency and the State of Texas in the above entitled litigation. As the attorney for those Defendants, I have been involved in the effort to consolidate sixteen lawsuits, seven of which have been filed in the last three weeks, and that effort has forced me to allow the organizational efforts of the bilingual trial to rest in the hands of my law clerk, Ms. Cecily Holiday.

Through her efforts and the change in philosophy as to the approach to this particular case, the size of the litigation has been substantially reduced, however, I have now put myself in the position where I am relying heavily on the presence of my law clerk at trial. Ms. Holiday's examination schedule runs from December 7th through December 17th. For that reason and that reason alone I am requesting continuance of this matter until the 18th of December. I am prepared to litigate through the Christmas holidays.

at the least reasonably should have recognized—that an issue outside the pleadings was being raised. *Jimenez v. Tuna Vessel Grenada*, 652 F.2d 415 (5th Cir. 1981). This is far from plain here.

Nor are we satisfied that the so-called "Final Pre-Trial Order" cut any figure of significance in the case. It was, simply, filed with the papers in the case something over a year before trial. No signature of counsel appears on it, no pretrial conference was ever held, and the court entered no order, oral or written, adopting it. In such circumstances, we are doubly reluctant to accord its ambiguous jargon the significance laid upon it by appellees' counsel, and we think the trial court erred in doing so.

Nor do we agree with the second basis upon which these issues are said to have re-entered contention: introduction at trial of evidence of historical discrimination. As counsel for appellees conceded at oral argument, all such matter was relevant to a statutory issue undisputedly pled and present in the case. Implied consent to try new issues cannot be derived from a failure to object to evidence that is relevant to subsisting ones. *Jimenez*, 652 F.2d at 421. Indeed, the sole objection voiced during the entire eight-day trial by defense counsel was to testimony that referred unresponsively to "denial of equal protection of the laws." In short, nothing in the trial of the case was of such a nature as to put the state on notice that constitutional issues were being reintroduced. The opening statements did not refer to them, the evidence did not address them in any unique respect, and the total conduct of the case was entirely consonant with the court's earlier order observing that "at best" two statutory issues only were being tried.

But this is not the last word or the end of the story. Having survived all these hazards and preserved the case free of constitutional questions, defendants steamed into harbor and tied up, only to sink at the slip. Four months after the close of the evidence, in May of 1980, counsel for the defendants filed a 114-page document entitled "Defendants' Proposed Opinion," ap-

parently by way of a written post-trial argument. In this presentation, counsel for the defendants laid to rest all such questions as are posed above by herself characterizing, in terms impossible to render more explicit, the issues in the case as constitutional ones:

> [T]he Court is being asked to find that the efforts made thus far by the State of Texas and the local educational entities of the State of Texas [are] inadequate under the Constitution of the United States. In other words, this Court is being asked to fashion a very detailed form of [curriculum], testing and funding to be employed by the State of Texas and the Texas Education Agency in the area of bilingual/bicultural education. Since the relief which is being sought goes far beyond an initial order to remedy *de jure* segregation, the analyses set forth in *Guadalupe, supra*, and *Keyes, supra*, bear substantially on this Court's decision. For unless there is a Fourteenth Amendment right to the particular form of education sought by the plaintiffs-intervenors in this cause, this Court cannot order the State of Texas to provide it. Even though the State of Texas has stipulated to many instances of historical discrimination against Mexican-Americans in Texas, that stipulation runs to a history which this Court believes has been substantially remedied both by orders of this Court and those of other courts in Texas. It would be the worst form of abuse of discretion for this Court to use its continuing jurisdiction under its previous desegregation orders to fashion a constitutionally based relief to a particular type of bilingual/bicultural education without utilizing the analysis which educational challenges under the Fourteenth Amendment require.

(citations omitted). It is thus apparent that counsel for the state defendants considered the constitutional issue as presented by the case and so indicated by arguing it to the court. In such circumstances appellants can scarcely be heard to complain that the court decided it. The factual basis of that decision is, however, another matter.

*Stipulations: Overture and Early Action*

We thus conclude that the appellants' complaints regarding the trial of constitutional matters and the absence of a three-judge tribunal do not require reversal of the judgment below. Their third point of error, however, relating to use by the trial court as the major basis for its decision of a series of very broad stipulations, presents more serious problems.

The critical portion of the district court opinion appears at 506 F.Supp. 411–14, where the court appears to conclude that *all* Mexican-American students throughout the State of Texas have historically been segregated from other students and subjected to other types of discrimination of various kinds.[4] From this, the court deduced the general presence of "De Jure Discrimination under the Fourteenth Amendment," as that portion of its opinion is headed, and proceeded to found upon this perception the extensive relief that its opinion mandates. The sole references to evidentiary matter made by the court in this portion of the opinion are to eleven stipulations of a broad nature, drawn from among about 450 entered into between defense counsel and the other parties under somewhat unusual circumstances. Given the breadth and conclusive nature of these stipulations, many of which were general concessions of ultimate fact, even of entire legal positions, it is understandable that the court felt no need to go beyond them. Stipulation No. 706, for example,[5] is that "[h]istorically, Texas has failed to effectively educate Mexican American students of limited English speaking ability." In the court's opinion, this becomes—and is the sole cited authority for—the determination that *"[n]o attempt was made* to meet the special educa-

tional needs of these children, who had limited proficiency with the English language." 506 F.Supp. at 412 (emphasis added). Others were of an even broader nature. The development of these factual agreements between counsel took place over a considerable period of time, and some account of the process involved is necessary to an understanding of our treatment of them. Since their number is large, we shall occasionally employ the eleven on which the court principally relied as a microcosm of the whole.

Insofar as the record reveals, the stipulations were initially proposed by plaintiffs-intervenors LULAC and GI Forum to defendants' counsel at some time in the summer of the year 1978, somewhat in the nature of requests for admission. At oral argument, counsel for plaintiffs-intervenors spoke of having "written" the stipulations, and we do not doubt that he did so. Nor does there seem to have been any significant modification of their form as prepared by him over the course of time; from their first record appearance, in the pretrial order, to their final form, when introduced as Exhibit 409 at trial, scarcely a word varies, and very few changes were made—even, it appears, some needful merely for accuracy.[6] Our comparison reveals only seven verbal modifications from start to finish, all minor.

After their composition by plaintiffs' counsel, the proposed stipulations were submitted to the TEA, which returned its response to the assistant attorney general then representing it, a predecessor of Ms. Dasher. We set out in the margin the eleven stipulations to which we have referred; following each we give the respons-

---

4. "The evidence presented on the motions for supplemental relief contains proof of pervasive, invidious discrimination against Mexican-Americans throughout the State of Texas. The extent of the discrimination is comparable in magnitude to the overwhelming evidence of state-supported racial segregation [of black students] which was found more than ten years ago."
506 F.Supp. at 411.

5. They are not sequentially numbered.

6. To take a random and minor example, No. 814 states: "The TEA Office of Technical Assistance is staffed by 12 professionals." TEA's actual reply to its counsel was, "No. The Office of Technical Assistance has eleven professionals." *State counsel nevertheless conceded that it had twelve, as originally proposed by plaintiffs.*

es TEA made for its attorney's guidance.[7] Affidavits in the record testify that TEA never altered these responses or authorized counsel to change them. Nevertheless, as we shall see, they were changed.

The stipulations first appear in the record as a portion of the pretrial order referred to earlier, which was filed on November 20, 1978. A total of 486 propositions were advanced; TEA had as of that time conceded 191 of these and objected to 295 of them. About a year later, on October 31, 1979, Ms. Dasher, now representing the state defendants, wrote a letter to the court in which she offered to concede on her clients' behalf —and, by subsequently filed affidavits, without their knowledge or permission—211 additional propositions (including all listed in note 7 above except the first, No. 514) on the sole condition that "the source of the . . . items, i.e., date and name are given . . . ." Five days before trial, on November 28, 1979, counsel met, and counsel for the state defendants made further concessions,

again, by later affidavit of Ms. Dasher and her clients, unauthorized. By the time of trial only about 30 of plaintiffs-intervenors' proposed stipulations remained disputed. At trial the stipulations came in as the first order of business. Eight days later the record closed, and the court took the matter under advisement. Post-trial briefs were due in May; and the record reflects no further significant activity in this case in the interval. It does, however, contain a transcript of Ms. Dasher's remarks made in the course of another case,[8] one tried in the interval, remarks that bear on her intentions in entering into these same stipulations.

Three months after this trial, on March 13, 1980, Ms. Dasher was engaged in representing the State of Texas in yet another case of great importance, that presenting for decision the question of whether alien children residing illegally in Texas were entitled to attend the public schools at taxpayers' expense. Reference was made

---

**7.**    514. Teachers who taught bilingually in violation of the "no Spanish rule" in the Texas state statutes until 1968 risked loss of jobs and/or revocation of their teaching certificates.

[TEA response:] No.

701. Segregation of Mexican American students is a historical fact in the Texas Public Schools.

[TEA response:] No.

704. Official publications of the Texas State Department of Education at one time reflected a police of Anglo racial domination over Mexican American people, their language and culture.

[TEA response:] No. The statement provides no basis for reference of specific publications and what those publications reflected is a conclusion.

706. Historically, Texas has failed to effectively educate Mexican American students of limited English speaking ability.

[TEA response:] No.

710. The so-called "no Spanish rule" was strictly adhered to and took the form of forbidding Mexican American children from speaking their native tongue while in the classroom, school halls, or playground.

[TEA response:] No.

711. Violators of the "no Spanish rule" were corporally punished, shamed, threatened, fined, suspended and expelled from school by Texas school administrators.

[TEA response:] No.

729. "Mexican schools" in Texas existed in 122 districts in 59 counties in 1942.

[TEA response:] The Agency has no information to confirm or deny these data.

735. J. W. Edgar, Commissioner after L. A. Woods, received about 22 complaints from different cities relevant to violations of *Delgado.* Schools cited were Hondo, Pecos, Kyle, Lockhart, Seguin. State Education authorities cooperated to allow local districts to systematically reject the burden of *Delgado.*

[TEA response:] No.

738. Historically, Texas educators have viewed public education as a vehicle for "Americanizing" the "foreign element."

[TEA response:] The Agency has no information to confirm or deny these data.

748. Mexican American children have historically been provided inferior facilities, often drastically over-crowded, sometimes necessitating ½ day classes.

[TEA response:] The Agency has no information to confirm or deny these data.

750. Texas sanctioned creation of separate school systems through approval of construction bonds which school board minutes indicate were explicitly designed for the construction or repair of Mexican schools.

[TEA response:] The Agency has no information to confirm or deny these data.

**8.** Filed in connection with efforts by the state at a later time to obtain relief from the stipulations, efforts that we discuss later.

there by opposing counsel to the stipulations in this case. Responding, Ms. Dasher advised the court:

Your Honor, perhaps I could clarify that. Mr. Liggett was not counsel in that case. The stipulations that are entered there are accompanied by another document. That document merely says that it is stipulated that these items of paper says these things. And in this case, he is reading from a monitoring report which was done at the Texas Education Agency. And I just want to clarify that because these are not things that we agree are true, just only that these things say that.

Thus we see counsel representing, as an officer of that court, for its reliance and at a time when the outcome of this case was not known, her understanding that the stipulations under discussion are not ones of fact but only of a testimonial nature: that certain writers or sources had in the past said this or that at a particular time and place. The "document" to which this transcript refers is a source list, also now present in the record but which, as we shall see, did not "accompany" the stipulations in the trial record as Ms. Dasher avows she believed, but came in later as part of Texas' effort to free itself from the stipulations.[9] And so the stage appears to have been set for a variation on the classic misunderstanding about stipulations, that warned against in every evidence class: is the stipulation meant to be that X is a fact, or is it meant to be only that A, if called, would *testify* that X is a fact?

To return to our case, post-trial briefs were duly filed in May 1980, defendants' taking the form of a "proposed opinion" tendering the constitutional issue, as discussed above. About that same time, yet another case went to trial before the court as a consequence of its statewide school surveillance, that involving claimed segregation of Mexican-American students in the Gregory-Portland Independent School District near Corpus Christi. One of its attorneys from this case represented the United States in that matter; Ms. Dasher represented the state and its agency; and the two joined forces against the school district. As a part of their joint presentation, these same stipulations were received in evidence by the court as United States Exhibit 10, over the objection of the school district that it had agreed to none of them, but with the acquiescence of Ms. Dasher. The tactical object of this maneuver by the state appears to have been to furnish grounds for invocation by the trial court, against the school district, of the *Keyes* presumption,[10] that where intentional discrimination is established in one substantial portion of a unitary school system, the remainder will be rebuttably presumed to be infected with it. And, indeed, the district court was led into error by the tactic, announcing at the outset of trial that, one of the parties (TEA) having confessed to discrimination in other parts of the Texas school system, the Gregory-Portland school district would be required to prove the negative of "no intentional discrimination," the *Keyes* presumption being in play against it.

At any rate, the decision to run with the hare in this case and to course with the hounds in *Gregory-Portland* bore evanescent fruit for the state. On August 6, 1980, the district court, in a lengthy opinion, held against the Gregory-Portland school district and TEA, citing and relying broadly on the stipulations and describing them as "the most telling evidence against TEA ...." *United States v. Gregory-Portland Independent School District*, 498 F.Supp. 1356, 1360 (E.D.Tex.1980), *rev'd*, 654 F.2d 989 (5th Cir.

---

**9.** Reference to that source list shows, for example, that the 11 stipulations quoted at n.7 above were taken from three writings only. Nos. 514, 704, 706, 710, and 711 derive from the 1977 doctoral dissertation of Dr. Ernesto Zamora, "A Status Survey of Texas' Bilingual-Bicultural Education Programs"; nos. 729, 735, 738, and 748 from Weinberg, "A Chance to Learn" (Cambridge University Press 19); no. 750 from

*Project Report: De Jure Segregation of Chicanos in Texas Schools*, 7 Harv. C.R.–C.L.L.Rev. 307 (1972); and no. 701 from the last two sources jointly.

**10.** Derived from *Keyes v. Denver Sch. Dist. No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).

1981). Also about this time, however, second thoughts appear to have begun to set in, together with a realization that in aligning itself with the United States in *Gregory-Portland* and seeking to use their two-party stipulations as ones to facts against the third-party school district, the state had fallen on its own sword. Just over a month after handing down of the district court's *Gregory-Portland* opinion, on September 15, 1980, Texas commenced its long—and thus far unsuccessful—campaign to obtain relief from the fatal stipulations to which Ms. Dasher had committed it.

*Stipulations: The Biter Bitten*

State's counsel, then, fresh from having assisted the United States in prevailing against the Gregory-Portland district, appears to have taken thought about the consequences of that victory for her position in this case. The result was the filing, on September 15, 1980, of an instrument designated as a motion for clarification of the 211 stipulations conceded in Ms. Dasher's letter of October 31, 1979, and, on the following day, of an amended motion to like effect.

The burden of the motion—supported by Ms. Dasher's affidavit, by a copy of her concession letter, and by the "source list"— was that the stipulations were not meant as ones of fact but rather as ones of reference. As the amended motion puts it:

Exhibit 76 [Ms. Dasher's concession letter of October 31, 1979], attached hereto, clearly states that withdrawal of the listed issues of fact from the contested list is conditioned upon the inclusion of the date and name of the source document.[11]

The State of Texas did not stipulate that the statements were true and correct. In fact the State of Texas contests the truthfulness of said statements. The State of Texas did stipulate that the statements had been made, however, the State of Texas did not intend to nor did it stipulate that the statements were correct.

Until September 9, 1980, defendant was not aware that the document providing the date and source had not been filed with the statements when plaintiffs filed those statements. (See affidavit of counsel attached hereto.) The source list is appended to this motion as Exhibit A.

In *United States v. Texas (Bilingual)*, defendant intended by this stipulation to eliminate months of trial by allowing the certain evidence to be admitted as uncontested providing the Court had the benefit of the source and could weigh it appropriately and determine its relevance. In no way were the stipulations to be deemed admissions; rather, they were set forth for the Court to utilize in making findings of fact, which findings have not yet been made.

Under the stipulations, had the plaintiff and the plaintiff-intervenors filed the source list, each statement would have included the source and date of the factual assertion. For example:

Stipulation No.
735     It is uncontested that plaintiff's Exhibit 622, *A Chance to Learn, The History of Race and Education in the United States at pages 168–169* states : "State education authorities cooperated to allow local school districts to systematically reject the burden of Delgado.

It is not an admission of defendant, merely an acknowledgment that certain exhibits which would normally be hearsay do make certain allegations. These exhibits, however, were and are completely irrelevant to any issue in this case.

---

**11.** The portion of the letter referred to states:
Dear Judge Justice:
   Defendants propose to withdraw the following listed items from the contested issues of fact in the pretrial order entered in this matter. If the source of the following listed items, i.e., date and name are given, Defendants no longer contest Plaintiff-Intervenor's proposed facts numbers 1, 3, [etc.].

The motion provoked a response from plaintiffs-intervenors LULAC and GI Forum couched in terms that are best described as savage[12] and a more temperate, though equally resolute, one from the United States. Each was supported by an affidavit of counsel taking direct issue with Ms. Dasher's affidavit filed in support of the motion to clarify: asserting that at all conferences between counsel the stipulations were considered to be and referred to as ones of fact and that the source list was never intended to be filed in court but was prepared by plaintiffs-intervenors as a working tool for the conference between counsel held prior to trial. Thus was joined serious issue as to the entire basis of the stipulations, with one of two conclusions only being possible: either counsel had entirely misunderstood each other regarding the impact of the stipulations through the course of many months of negotiations and at least one face-to-face conference, or counsel on one side or the other had lied to the court, in writing and under oath. Despite this—as it strikes us—most unusual situation, the court set no hearing but simply entered its order of December 31, 1980, denying the motion to clarify. In doing so, the court essentially adopted plaintiffs-intervenors' version of counsels' negotiations, referring to defendants' version as "recently contrived" and as "belie[d]" by the factual history of the stipulations. Next followed, on January 9, 1981, an opinion holding against the defendants on the fourteenth amendment issue, primarily if not exclusively on the basis of the eleven stipulations set out at note 7 above, 506 F.Supp. at 411–14. The court also, while rejecting a Title VI claim, found for plaintiffs on two provisions of the Equal Educational Opportunities Act, 20 U.S.C. §§ 1703(f) and 1703(b).

The next several months were occupied by questions of remedy and with Texas' attempt to postpone final action until a special task force appointed by the governor had had time to make its report and for that report to be acted upon by state authorities. In middle April 1981, however, the court handed down its own extensive and detailed plan requiring, among other things, the establishment of bilingual education programs throughout the state in public school grades from kindergarten through high school. On June 23, 1981, we handed down our opinion in *Castaneda v. Pickard*, 648 F.2d 989 (5th Cir. 1981), where we laid down, in a careful opinion by Judge Randall, the manner in which challenges advanced under the Equal Education Opportunities Act to Texas school systems' language-remediation programs should be handled. As we shall see, the treatment that we there required of those questions is not consonant with the handling of them by the court below in this case.

*The Stipulations: Finale in the Trial Court*

Although the state defendants had already noticed an appeal in May, on July 6, 1981, they filed a further series of motions in the trial court seeking relief from the stipulations and otherwise: a request for stay of the court's order pending this appeal, a motion to vacate the court's order and withdraw its opinion, and a renewed motion to withdraw the stipulations. The first of these addressed the usual factors to be considered in passing on requests for stay, as well as others.[13] The second concerned itself primarily with the court's handling of the constitutional issues, including its refusal to convene a three-judge court, with the effect of our opinion in *Castaneda v. Pickard, supra,* and with the effect of the more comprehensive Texas statute governing language remediation, passed and signed into law in June 1981 after the

---

**12.** TEA is there advised that it "should be embarassed to file this Motion" which "is founded on demonstrably false justifications." Elsewhere in the response, the motion is characterized as "a Public Relations gimmick," as "made in bad faith," as "flatly contradicted by the facts," etc. We are nonplussed that exchanges between counsel couched in such terms should remain merely verbal.

**13.** On August 21, 1981, a panel of this court granted an effective stay of the district court's order, it having previously been temporarily stayed by a single judge on August 19.

court's opinion and chief orders in this case had already been handed down.

Finally, the motion regarding the stipulations, supported by the affidavits of Ms. Dasher and concerned officials of TEA, reasserted counsel's misunderstanding of their effect, asserted that they were authorized by neither the TEA—Ms. Dasher's client—nor by her superiors in the Office of the Attorney General, and offered to prove that the "more extreme" of the stipulations were either distortions of the facts or entirely untrue.[14] As the state's brief on appeal points out, for example, of the eleven stipulations upon the cited basis of which the court decided the constitutional matters, seven were denied by TEA (as opposed to its counsel) and four were neither confirmed nor denied for want of information. Some of these, such as No. 701,[15] are extraordinarily broad, open-ended, and damaging to the state's case. Nevertheless,

14. The affidavit of Mr. Ryan, General Counsel for the Central Education Agency of the State of Texas, states in part as follows:

I am the General Counsel for the Central Education Agency, State of Texas, and have served in such capacity since September 1, 1979. As part of my duties, I am responsible for coordinating litigation involving the Central Education Agency in the state and federal courts and for acting as liaison between the Agency and the Office of the Attorney General of Texas.

*The document entitled "STIPULATIONS" introduced at the opening of trial in this matter as Plaintiff-Intervenors' Exhibit 409, was entered without my knowledge or consent, express or implied. Furthermore, my office was not provided copies of any documents or correspondence withdrawing items from the contested issues of fact.*

(emphasis added). That of Mr. Anderson, Executive Assistant to the Deputy Commissioner for Program Administration & Finance, stated:

In the summer of 1978, Roland Allen, the Assistant Attorney General then assigned to represent the Texas Education Agency in Civil Action No. 5281: *U. S. v. Texas* (Bilingual), requested that the Agency review a set of proposed stipulations submitted by Plaintiffs-Intervenors. The Agency was requested to advise Mr. Allen as to the stipulations with which the Agency could agree and those with which the Agency could not agree.

The proposed Findings of Fact as submitted by Plaintiffs-Intervenors were numbered 1–1411. However, the proposed stipulations totaled approximately 475, inasmuch as gaps existed in the numbering. I participated with other selected Agency employees in determining which of the proposed facts could be stipulated. A response on behalf of the Agency was prepared, entitled "Civil Action 5281/Proposed Responses/Plaintiff-Intervenors Proposed Findings of Fact and Conclusions of Law", dated August 17, 1978 (a copy of which is attached hereto as Exhibit 2). This document contains the Agency's response to each of the proposed stipulations and indicates as to each whether the Texas Education Agency agreed, did not agree, or did not have data upon which to base a judgment. The Texas Education Agency agreed to 198 of the proposed stipulations of fact, did not agree to 250, and agreed with certain understandings or exceptions contained in 27 of the proposed stipulations. A copy of the document attached hereto as Exhibit 1 was provided to Assistant Attorneys General, Roland Allen and Bob Giddings.

During the spring and summer of 1979, the proposed stipulations were discussed with the Assistant Attorney General then assigned to the litigation, Ms. Susan Dasher. *Ms. Dasher was provided with a copy of Exhibit 1. No person on the Agency staff responsible for evaluating the proposed stipulations submitted by Plaintiffs-Intervenors agreed, explicitly or implicitly, to stipulate to the accuracy of the proposed findings of fact as used by the Court in its Memorandum Opinion. No authorization was granted by the Agency to the Office of the Attorney General to stipulate to any proposed findings of fact submitted by Plaintiffs-Intervenors in a manner inconsistent with responses as contained in Exhibit 1. Exhibit 1 constitutes the Agency's position on the proposed stipulations as presented by Plaintiffs-Intervenors.*

(emphasis added). Finally, Ms. Dasher's affidavit reads, in pertinent part:

On October 31, 1979, I wrote a letter to the Court and the parties wherein I agreed to withdraw objections to certain proposed findings and exhibits so long as the source, date and name for those findings were given. I met with plaintiff-intervenors' attorneys on November 28, 1979, in order to accomplish this goal.

While the plaintiff-intervenors' proposed findings were reviewed with mid-level Texas Education Agency staff with a view to determining which findings we would offer evidence to rebut, *the entering of the stipulations was not authorized by the policymaking officials of the Texas Education Agency or my superiors at the Attorney General's Office nor was such authorization sought.*

(emphasis added).

15. "Segregation of Mexican American students is a historical fact in the Texas Public Schools."

three weeks later, on July 30, and without conducting a hearing to inquire into these matters, the district court denied all of the defendants' motions, observing that TEA voluntarily chose its representation[16] and that "[i]f the defendants are dissatisfied with the quality of representation they received at trial, as exemplified by the evidentiary stipulations and agreements entered into by their counsel, they have a clear remedy under state law in the form of an action for legal malpractice."

Finally, to complete the table of surrounding events, two weeks before the final order, on July 16, 1981, we had vacated the injunction under which Ms. Dasher had been practicing law in Texas for reasons entirely unrelated to the matter in hand, thus in effect removing her from the rolls of the Texas bar. *Dasher v. Supreme Court of Texas, supra.* And on August 20, 1981, we handed down our opinion in the companion case to this suit, *United States v. Gregory-Portland Independent School District,* 654 F.2d 989 (5th Cir. 1981), reversing the judgment of the district court and setting aside its opinion, one that it had relied on to some degree in the opinion herein.

*The Stipulations: Procedural and Substantive Infirmities*

It thus appears, essentially without contradiction, that the stipulations upon which the judgment below is based were entered into by Ms. Dasher without authority from her client and, in fact, in general disregard of its instructions to her.[17] More, that

these circumstances were made known to the trial court months before its opinion—largely, indeed all but entirely, based on the stipulations—was handed down. The case, moreover, is one affected with the public interest to an unusual degree, bearing as it does on the education of hundreds of thousands of school children and on broad state educational policy. That such issues should have been resolved on the basis of stipulations that were disputed as to accuracy by the state agency possessing special competence in their factual area and were conceded under the circumstances related by an attorney having little or no such background—in the stated belief that her concessions were irrelevant—leaves us in grave doubt as to the entire factual underpinning of the judgment below.[18]

Nor are we much reassured when we turn from the circumstances of their confection to the substantive content of the eleven critical stipulations. Of the eleven, five concern past de facto segregation of Mexican-American students. The most concrete of these is Number 729, which states that in 1942 "Mexican schools" existed in 122 school districts in Texas, located in 59 counties.[19] Elsewhere in the record we learn that at that time, the year 1942, there were 6,027 school districts in the state. Thus the stipulation could fairly be read to assert that at the high-water mark of Mexican-American de facto school segregation in Texas, early in World War II, about two percent of Texas school districts were affected with

---

**16.** In this the court was mistaken. Under Texas law the attorney general enjoys an exclusive right to represent state agencies, and if the services of other lawyers are to be had it must be with his permission and "in subordination" to his authority. V.A.T.S. art. 4395; *Hill v. Texas Water Quality Board,* 568 S.W.2d 738 (Tex.Civ.App.—Austin 1978, writ ref'd n.r.e.).

**17.** While the district court rejected the state's version of the intended effect of the stipulations as merely to references, it voiced no disagreement with this aspect of the showing made. Texas has been at particular pains to attempt to circumscribe the power of the attorney general to make admissions on its behalf. V.A.T.S. art. 4411 provides: "No admission, agreement or waiver, made by the Attorney General, in any action or suit in which the

State is a party, shall prejudice the rights of the State."

**18.** Especially is this so where, as here, the critical portions of the court's opinion contain explicit references to the stipulations and to nothing else in the record. We think it improper to seek to support the trial court's judgment by reference to other record evidence when this judgment rests on such waivers of proof as the stipulations here represent.

**19.** Presumably, since the stipulation was prepared and proposed by appellees—"written" by them, as we were advised at oral argument—something akin to the immemorial pleading presumption applies: that the most extreme claims supportable were advanced.

schools intended solely for Mexican-American students. This, then, represents the worst of what is meant by segregation of such students as "a historic fact" (Stip. 701); this the manner in which the state cooperated to allow local districts to construct such schemes and "to systematically reject the burden of *Delgado*" (Stips. 735, 750); these the inferior and overcrowded facilities of which Stipulation 748 speaks.

The remaining six stipulations are so vague as to time, place, and event as to constitute little more than argument. Number 514, for example, asserts that before 1968 teachers who taught bilingually "risked" loss of job and teaching certificate. The statement seems more notable for what it does not assert: that teachers in general who did so, let alone any named teacher, ever *lost* either job or certificate.[20] Similarly vague are the assertions that "historically" Texas educators have viewed public education as a vehicle for "Americanizing" the "foreign element" (Stip. 738)[21] and that "at one time" TEA publications reflected a policy of Anglo domination over Mexican-Americans (Stip. 704). Another recites that, again "historically," Texas has "failed to effectively educate Mexican-American students of limited English speaking ability." (Stip. 706). Again, it is difficult to tell what is meant: that none have been effectively educated? That some have not been? At all times in the past? At some time in the past? The final two, numbers 710 and 711, characterize the state's former total immersion policy as a "No-Spanish" Rule, noting that under it all students were required to speak English at school and that those who did not do so were punished, sometimes severely. We have already, in *Gregory-Portland, supra,* had occasion to point out that the so-called "No-Spanish" Rule was nothing of the kind. A statute adopting the total immersion approach to language acculturation, it does not appear to have been directed against the Spanish language or any other,[22] but rather at advancing the students' mastery of English. *See United States v. Gregory-Portland Independent School District,* 654 F.2d at 999–1001. Apparently deriving its initial emotional impetus from the anti-German xenophobia of 1918, the Texas statute mandated the use of English as the language of public school instruction but explicitly allowed the teaching of German, Spanish and various other languages as branches of study.

Thus, the eleven major stipulations. Our critical inspection of them has been conducted, not with a view to establishing factual conclusions—such as that if it be agreed between litigants that a maximum of two percent of the school districts within Texas contained "Mexican schools," it seems to follow that a minimum of 98 percent did not—but in order to attempt to assay what factual conclusions they might properly be seen to support. Broadly speaking, these are two. The first is that at some past time in Texas, total immersion in English, the dominant language of our culture, was viewed as the best and fastest way to master it. The second is that about 40 years ago intentional de facto segregation of Mexican-American students occurred in as many as 2.1 percent of Texas school districts, the largest percentage for which counsel could find written assertion in the literature of the subject. It is difficult for us to avoid concluding that these form a slender basis indeed for the sweeping statewide order imposed by the trial court on the basis of past constitutional violations.

*The Stipulations: Conclusions*

Coming to the close of our survey of the record and of the actions of the court below, we think it apparent that in a case of this character the order entered cannot stand.

**20.** Nor is Dr. Zamora's dissertation, the source of the stipulation, more specific. The source reference of the stipulation is to a single sentence on page 33 of the dissertation: "Furthermore, it is also a known fact that teachers risked losing their jobs and/or revocation of their teaching certificates if they taught bilingually."

**21.** A notion sometimes celebrated elsewhere as "the melting pot."

**22.** Except in some degree, at its inception, the German language.

At stake here are the educational policies of an entire state, matters traditionally, in our federal system, viewed as primarily state concerns. The issue is essentially a pedagogic one: how best to teach comprehension of a language. Neither we nor the trial court possess special competence in such matters. It follows that on such thin ice both tribunals should tread warily, doing no more than correcting clear inequities and leaving positive programming to those more expert in educational matters than are we. *See Morales v. Shannon*, 516 F.2d 411, 415 (5th Cir. 1975), *cert. denied*, 423 U.S. 1034, 96 S.Ct. 566, 46 L.Ed.2d 408 (1975).

Blessed with a problem so essentially uncongenial to judicial resolution, our court system has thus far preempted the efforts of the state to prevent an *ipse dixit*, rushing in just before the fact to impose the solutions that our dispute-resolution process has thrown up on the state's educational system and foreclosing those arrived at by the legislative process.[23] Let it be noted at this point, however, that we do not doubt our parallel process has had a useful effect, if one of no more than celerity, upon the state's arrangements.

As we noted at length above, the efforts of counsel for the state authorities have resulted in an adjudication that can only doubtfully be viewed as the result of an adversary process. Counsel's concessions have produced a statewide order essentially grounded in conditions shown to have prevailed in a miniscule proportion of the state's educational system. Even these concessions were entered into against the instructions of the responsible client. A proceeding so fundamentally flawed cannot, we conclude, serve as an appropriate basis for the far-ranging and essentially legislative remedial order entered by the trial court. And, as we have sought to demonstrate above, even the results of such a trial by concession as we view here form a slender and dubious basis for the sweeping measures decreed below.

The case is unique, and we proceed to the resolution of its appeal without great assurance or satisfaction. Rule 16, Fed.R.Civ.P., requires that such a pretrial order as was proceeded upon here—if "entered"—controls the proceedings "unless modified at the trial to prevent manifest injustice." The trial judge possesses "broad discretion in determining whether or not a pretrial order should be modified or amended." *Del Rio Distributors v. Adolph Coors, Inc.*, 589 F.2d 176, 178 (5th Cir. 1979) *cert. denied*, 444 U.S. 840, 100 S.Ct. 80, 62 L.Ed.2d 52; *see also Reyes v. Vantage S.S. Co.*, 672 F.2d 556, 557 (5th Cir. 1982). The trial court has not only the right, *Laird v. Air Carrier Engine Service*, 263 F.2d 948 (5th Cir. 1959), but the duty to relieve counsel from pretrial stipulations where necessary to avoid manifest injustice and adjudications based on the sporting theory, *Central Distributors, Inc. v. M.E.T., Inc.*, 403 F.2d 943 (5th Cir. 1968). Stipulations couched in conclusory, not evidential, factual terms are entitled to less deference than others. *Cf. Aetna Life Insurance Co. v. Barnes*, 361 F.2d 685, 690 (5th Cir. 1966) (stipulated matter not foreclosed on remand). We conclude that in denying, in the circumstances presented, even such belated and untimely motions as we view here to withdraw the stipulations upon which the court's judgment and consequent remedial program rests, the trial judge abused that broad discretion. If the state's entire legislative process is to be superseded in such circumstances by the order of a single judge, it must be upon the basis of firmer matter than appears in this record.

In sum, for three interrelated reasons the stipulations here do not provide factual support for the court's finding of historical segregation of Mexican-Americans: First, they went beyond the authority expressly conferred on counsel and were entered into without the clients' consent. Second, the stipulations essentially settled the case, again without authority from the

---

**23.** The state's extensive new remedial-language program, providing for both bilingual education and English-as-a-second-language instruction, was signed into law on June 12, 1981. The court's corresponding plan had been decreed on April 17, 1981.

clients, thereby imposing a manifest injustice on the State of Texas and denying its rights to an adversary proceeding. Finally, the stipulations were too conclusory to warrant a factual determination of historical discrimination. Evidence that Mexican-American students have in the past been segregated in 2.1 percent of the state's schools does not, as a matter of law, suffice to prove that the state as a whole has in the past discriminated against Mexican-American students.

*The Statutory Grounds*

What we have said regarding the factual basis of the court's constitutional ruling applies as well to its finding of a violation of 20 U.S.C. § 1703(b), which rests on the same factual premises. Its application to the court's ruling on 20 U.S.C. § 1703(f) is less direct, however. The case was tried and decided prior to our decision in *Castaneda v. Pickard*, 648 F.2d 989 (5th Cir. 1981), wherein we held at substantial variance with the result attained below as to section 1703(f). Although we agreed with the holding of the district court that proof of a violation of section 1703(f), which requires educational agencies to take "appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs," does not require proof of invidious intent, our decision is otherwise incompatible with that of the district court. That court held that only bilingual instruction, as "uniquely suited to meet the needs of the state's Spanish-speaking students," 506 F.Supp. at 433, would suffice to meet the requirements of section 1703(f) and, so holding, ordered it throughout the public schools of the state in all grades.

At about the same time, however, we were noting in *Castaneda* that by enacting section 1703(f) Congress "did not specify that a state must provide a program of 'bilingual education' to all limited English speaking students" but rather "intended to leave state and local educational authorities a substantial amount of latitude in choosing the programs and techniques they would use . . . ." 648 F.2d at 1009. In the process and subject to a remand on other points, we provisionally approved, as not offensive to section 1703(f), the language-remediation program of the Raymondville Independent School District, which provided for bilingual education in grades K–3 only, with auxiliary tutoring, Spanish-speaking teacher aides, and English-as-a-second-language classes. We also laid down a three-step test for compliance with section 1703(f): Is the program based on an educational theory recognized as sound or at least as a legitimate experimental strategy by some of the experts in the field? Is it reasonably calculated to implement that theory? Has it, after being used for a time sufficient to afford it a legitimate trial, produced satisfactory results?[24]

■ At trial, plaintiffs' experts presented abundant testimony supportive of the court's finding that the 1973 Texas bilingual program was pedagogically unsound, largely unimplemented, and unproductive in its results. Plaintiffs' experts testified that one hour of intensive English per day for grades four through twelve was not adequate, that the first educational experience of these children had to be bilingual, and that the state's overall proficiency score of 23 percent on a written standardized test did not justify entry into a normal classroom. The evidence was even more over-

---

**24.** We emphasize, in view of our remand and the differing problems and solutions which may in future be shown to exist in the many and diverse school districts of Texas, that our decision today does not explore the reach and manner of application of § 1703(f) so as to foreclose by implication issues not raised here. Among these are such questions as how broad a power of "de novo" review and revision may be exercised by a district court over language barrier programs, consistent with the rule that

Congress cannot invest Article III courts with jurisdiction to "exercise functions which are essentially legislative or administrative." *Federal Radio Commission v. Nelson Brothers Bond & Mortgage Co.*, 289 U.S. 266, 275, 53 S.Ct. 627, 632, 77 L.Ed. 1166 (1932); or how legislation deriving its force from the Fourteenth Amendment applies to such situations as that of an adult twelfth grader with no knowledge of English who enters Texas from Mexico—or from the U.S.S.R.

whelming concerning the TEA's lack of implementation of the existing, under-funded program. Despite evidence that bilingual programs were not actually bilingual in many school districts, sanctions were not being imposed. In fact, the state apparently lacked an adequate monitoring instrument, and limited English-speaking students were not being adequately identified. To counter these allegations, the state put on only one witness. Undoubtedly there was adequate evidentiary support for a conclusion that in some areas local programs for remedying the educational handicaps of limited English-speaking students were deficient.

■ Where the court erred, however, was in its denial of the state's post-trial motion to vacate the injunctive remedy on the ground of mootness. The TEA argued, in our opinion persuasively, that the Texas Legislature's enactment of the 1981 Bilingual and Special Language Programs Act made the court's injunctive relief unnecessary. The 1981 Act goes significantly beyond the 1973 scheme and tracks the court's eventual remedial order quite closely. Although it compels bilingual education only through the elementary grades, it, for example, mandates bilingual education in school districts with 20 or more students with limited English-speaking proficiency in the same grade, authorizes the TEA to adopt "standardized entry-exit criteria," and compels the TEA to take certain specific measures, including on-site monitoring, to insure compliance. The court's refusal to reconsider its injunctive order in light of the 1981 Act imposed a judicial gloss on the new legislative scheme without testing that scheme against the requirements of section 1703(f) as elaborated by *Castaneda*.[25] In these circumstances, the court's judgment may not legitimately be sustained upon the section 1703(f) ground.

## The Absence of the School Districts as Parties

Complaint is also made by the state regarding the absence as parties from our case of school districts whose interests and programs will be affected by any final judgment. There is force in the contention, and in view of the fact that we must order a remand on the grounds stated above, we shall assume without deciding that the state has standing to raise it.

■ If remedial orders are to be imposed in Texas school districts on grounds of past segregation of students within the given district, that district must first be heard. Such orders interfere with the district's management of its own affairs and can entail substantial expenditure of funds; their effects are in no wise *de minimis*. As we noted only last year in *Lee v. Lee Coun-*

---

**25.** The court's response to the state's mootness argument was that:

> Defendants argue that the enactment of S.B. 477 on June 12, 1981, created a new program for addressing the learning difficulties of LEP [limited English-proficiency] students which must be given a chance to work before it can be evaluated as a success or failure. Yet the new statute does not substantially alter the theoretical basis of the defendants' approach, nor does it significantly increase the resources allocated to carry out that approach. Limited ESL [English-as-a-second-language] instruction is still authorized in school districts falling under a specified numerical threshold and in all grades after elementary school. Remedial or compensatory programs for children who fall behind in academic areas while becoming proficient in English are not mandated. The new legislation contains some reform provisions, but it does not establish a new approach.

We search in vain, however, for evidentiary support for the court's conclusion that the new legislation does not establish a new approach. The expert testimony at trial, after all, was directed at the inadequacies of the 1973 scheme, not the 1981 Act. The Department of Justice, in fact, argues that the 1981 Act, if supplemented by provisions for students of all ages (and in districts with fewer than 20 per grade) who have not had the full complement of bilingual education at the elementary grades, by appropriate provisions for individual assessments of student proficiency, and by provision for teacher recruitment and training, "comes very close to being one acceptable way of complying with § 1703(f)." Thus, the Department of Justice urges remand to enforce the order "going back to the baseline of state law." We need not attempt to resolve the abstract question of the adequacy of the 1981 Act under § 1703(f) criteria. We merely note that the question was never even canvassed at trial.

ty *Board of Education*, 639 F.2d 1243, 1256 (5th Cir. 1981), summarizing a holding of *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), "a federal court cannot impose liability on individual defendant school districts on the basis of a general inverse respondeat superior theory holding them presumptively responsible for actions of the state or another governmental entity . . . ." Nor, as we pointed out in *United States v. Gregory-Portland Independent School District, supra*, is it possible to extrapolate from a finding that Mexican-American students have been segregated in one Texas school district to the conclusion that this has occurred in another or others: pupil assignments in Texas are the exclusive perogative of the local districts, and the reasons why one independent decision-maker does a thing can never, in logic, tell us much about why another acted. As we there pointed out, application of the *Keyes* presumption assumes a single decisionmaker, reasoning that the motive with which he acted in one instance is probative of his intent in taking similar actions. Here, where there is no such single referent, the presumption has no application. And as the record here shows, the geographical distribution of Mexican-American students in Texas, like that of black students, is anything but homogeneous across the state; hence, conditions vary substantially from school district to school district, some districts comprising heavy majorities of Mexican-American students, some having virtually none. For these reasons, as to most such questions the Texas situation does not readily lend itself to statewide treatment. At all events, no local district may be subjected to remedial orders based on past segregative or other constitutionally invidious local practices of which it has been condemned unheard. This is, of course, as true of the section 1703(b) ground—which requires proof of action taken with invidious intent—as of the fourteenth amendment one.

The same may be true of orders grounded in 20 U.S.C. § 1703(f), though for different reasons. As the district court correctly held, that statute does not require for its application proof that a failure to take "appropriate action to overcome language barriers" was motivated by intent to discriminate. *Castaneda v. Pickard*, 648 F.2d 989 (5th Cir. 1981). It does require, however, proof of various matters that may vary from district to district as a result of the substantial latitude Congress granted state and local authorities to choose the programs and techniques they would use to meet their obligations under the Equal Educational Opportunities Act, of which section 1703(f) is a part. *Id.* at 1009. Questions such as whether a particular district's program is based on an arguably sound educational theory, is reasonably calculated to implement it, has proved out after a legitimate test, and represents a genuine good-faith effort consistent with local circumstances and resources—all inquiries suggested and some directed by *Castaneda v. Pickard, supra*—require the presence of the district concerned for proper adjudication. Nor are they such as to invite multidistrict resolution as an economical measure. Indeed the existence around the state of language-remediation programs, such as the record indicates, that were devised by school districts on their own initiative and that in some instances appear to go beyond anything required by general state law indicates the inequity of treating such entities equally with others that may have done little or nothing.

Finally, the existence of litigation, some of it ongoing as is *Castaneda*, which focuses on the programs of particular districts and for which the court's statewide order makes no exception, indicates the inadvisability of attempting to deal with the problems of hundreds of differing districts on some procrustean, statewide model. The result can only be the subjection of particular districts to conflicting directives from multiple sources—as the Raymondville Independent School District, the specific subject of *Castaneda* but covered by the district court's statewide order herein as well, stands at present.

In sum, we conclude that there exists little if any practical or logical justification

for attempting to deal on a statewide basis with the problems presented by this case. As we noted in *Castaneda v. Pickard, supra,* in enacting section 1703(f), Congress left the state and local authorities substantial latitude to select programs and techniques of language remediation suitable to meet their individual problems. Texas' 1981 Act does likewise as to local school districts. The thrust of the new statute is not to restrict or limit district programs to help students of limited English-speaking proficiency but rather to encourage such programs while setting certain minimums—many of which may be complied with in more than one way. These minimums achieved, each district is free to add both innovative programs and additional ones of like kind.

As this case indicates, the language problems to be met will necessarily vary by district, running the gamut from acute to insignificant. Except for certain special schools for handicapped students, the State of Texas, *qua* state, directly educates no one; this is the work of the school districts. It follows, then, that whether the effect of a local language program, state-mandated or not, constitutes appropriate action to deal with language barriers faced by the students of a given school district will of necessity be an essentially local question. Either the actual, local program as it operates on actual, local students is an appropriate response to their language problems or it is not. If it is, then section 1703(f) has been complied with as to these students; if not, it has not been. And since the type and level of program to be instituted is in great part left to the individual district, it necessarily follows that one district may be in compliance, while another next door to it may not. We fail to see how such questions as these can be properly resolved in the absence of the school district concerned or how they can effectively be dealt with on a statewide basis. In the exercise of our supervisory powers, we therefore direct the district court to determine, in light of the foregoing, what questions—if any—presented by the case are subject to resolution on a statewide basis before proceeding further on the remand that we mandate.

Nor is any reason readily apparent to us why local school districts should be required to litigate their cases in the Eastern District of Texas, when they are located elsewhere. For an El Paso district, this means litigation at a distance of over 700 miles; for a Brownsville district, litigation over 500 miles away. Given the sheer size of Texas, such considerations of venue take on special significance. We therefore likewise direct the district court, in the event that individual school districts are made parties hereafter, to give serious consideration to such motions for change of venue as may result—to the end that, in the absence of some overriding reason to the contrary, local school districts may litigate in their local federal courts.

REVERSED AND REMANDED.